**Raymond COATES, Appellant,**

v.

**Michelle ELZIE, Appellee.**

**No. 00–CV–424.**

District of Columbia Court of Appeals.

Argued Jan. 23, 2001.

Decided March 15, 2001.

---

Daniel M. Schember, with whom Alisa A. Wilkins was on the brief, Washington, DC, for appellant.

Donna M. Murasky, Senior Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before FARRELL, RUIZ, and WASHINGTON, Associate Judges.

FARRELL, Associate Judge:

Plaintiff-appellant Coates, then a sentenced prisoner housed in the general population at the Central Facility in Lorton, Virginia, was transferred to the Maximum Facility in October of 1997, where he remained in administrative segregation until April 1998. He later sought relief in Superior Court, contending that the placement in segregation violated his rights under the Lorton Regulations Approval Act of 1982 (LRAA or the Act) and the underlying regulations. The Superior Court agreed, and the District of Columbia has not challenged that decision. Instead, the sole issue before us is whether the trial court correctly ruled that the LRAA and the regulations do not create an implied cause of action for damages resulting from unlawful administrative segregation. We agree with the trial court that the LRAA reveals no intention of the legislature to provide such a right of action, and we therefore uphold the dismissal of Coates's amended complaint for damages.

## I.

Coates's transfer to administrative segregation stemmed from an accusation that he had incited a work stoppage at Lorton. A Department of Corrections adjustment board held a housing hearing and determined that his alleged conduct did not provide grounds for removing him from the general prison population. Warden Michelle Elzie reviewed the decision and disagreed, ordering that Coates be housed in the Maximum Security Facility. While maintained there in administrative segregation status,[1] Coates lost income because he could not work, was denied rehabilitative programs, and suffered restraints on his liberty greater than those at the Central Facility. After requesting unsuccessfully that Warden Elzie and her successor reconsider the segregation order, Coates brought suit against Elzie and others in their official capacity, alleging federal and local statutory violations. Eventually the claim was narrowed to one alleging violation of the LRAA and underlying regulations. Construing the applicable regulations, Judge Burgess concluded that Elzie had violated Coates's rights by removing him from the Central Facility without a finding, required by 28 DCMR § 521.4 (1987), that he constituted a clear and present threat to the safety of himself or others or a definite escape risk. The judge asked Coates's counsel to submit a proposed order implementing the decision.

Instead of that order, Coates filed an amended complaint for money damages from Warden Elzie in her individual capacity and equitable relief from the District of Columbia. He subsequently dismissed the latter claim voluntarily. Conceding that the LRAA contains no express provision for a cause of action for damages, Coates asserted that under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), and related decisions of this court, the LRAA should be construed as providing a right of action for damages by implication to prisoners like Coates who have been injured by unlawful administrative segregation. In a careful

---

1. In April 1998 Coates was transferred from the Maximum Facility to the Adult Unit at the Lorton Youth Center, where he remained at the time of suit.

written opinion, Judge Burgess rejected this contention and dismissed the amended complaint.

## II.

■ On repeated occasions, we have summarized the history, purpose, and legally binding character of the Lorton regulations governing discipline and placement of Lorton inmates in administrative segregation. *See, e.g., Moore v. Gaither,* 767 A.2d 278, 279–80 (D.C.2001); *Smith v. Moore,* 749 A.2d 132, 135 (D.C.2000). The regulations were adopted by the Mayor of the District of Columbia in settlement of class-action law suits brought by Lorton inmates challenging, *inter alia,* the absence of notice and hearing procedures related to segregation. *See generally, Wright v. Jackson,* 505 F.2d 1229 (4th Cir.1974). Pursuant to the authority of the Council of the District of Columbia over adoption of such regulations, *see* D.C.Code § 24–442 (1996), the Council enacted the Lorton Regulations Approval Act of 1982 (LRAA), 28 D.C.Reg. 3484 (1992), which provides in its entirety as follows:

AN ACT

4–224

IN THE COUNCIL OF
THE DISTRICT OF
COLUMBIA

To approve certain regulations issued by the District of Columbia Department of Corrections.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Lorton Regulations Approval Act of 1982".

Sec. 2. The Council of the District of Columbia approves the regulations setting forth the administrative procedures for adjustment and housing actions and the code of offenses governing residents of the Lorton Correctional Complex as adopted by the Director of Corrections on February 18, 1981, and published in the *D.C. Register* on February 27, 1981 (25 DCR 865).

Sec. 3. This act shall take effect after a 30 day period of Congressional review following approval by the Mayor (or in the event of veto by the Mayor, action by the Council of the District of Columbia to override the veto) as provided in section 602(c)(1) of the District of Columbia Self–Government and Governmental Reorganization Act, approved December 24, 1973 (87 Stat. 813; D.C.Code, sec. 1–233(c)(1)).

The issue this case presents is the limited but important one of whether the Council, in enacting the LRAA, intended to create a private right of action for money damages by prisoners alleging violation of the Lorton regulations. Since the statute creates no such right expressly, the parties agree that ordinarily the question would be answered by application of the three-part test of *Cort v. Ash, supra,* to determine whether there is an "implied" right of action. *See, e.g., In re D.G.,* 583 A.2d 160, 166 (D.C.1990) (applying *Cort* standards). Coates argues initially, however, that this court has already decided the issue. He maintains that in *Vaughn v. United States,* 598 A.2d 425 (D.C.1991), the court effectively held that suits for violation of the Lorton regulations could be brought under the general civil jurisdiction of the Superior Court, *see* D.C.Code § 11–921(a)(6) (1995). That being so, Coates asserts, this case is governed by the longstanding rule that " '[w]here legal rights have been invaded, and a ... statute provides for a general right to sue for such invasion, ... courts may use any available remedy to make good the wrong done.' " *Franklin v. Gwinnett County Public Schools,* 503 U.S. at 66, 112 S.Ct. 1028 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

Coates misreads our decision in *Vaughn*, which arose under a different statutory scheme. *Vaughn* concerned an appeal from a sentencing judge's decision sustaining a determination by the Department of Corrections that Vaughn, a youth offender, would derive "no further benefit" from treatment under the Youth Rehabilitation Amendment Act. *See* D.C.Code § 24–805(a) (1996). Vaughn argued that the Department had violated regulations embodied in the LRAA in reaching its no-further-benefit determination. The government countered at the threshold that Vaughn could not raise any such irregularities before the sentencing judge, "because he could have raised the issue by filing a petition for a writ of habeas corpus" under D.C.Code § 16–1901 after exhausting administrative appeals. *Vaughn*, 598 A.2d at 431. In language Coates now relies on, this court rejected that argument, stating: "As to the extraordinary writ of habeas corpus, although it was available to [Vaughn] to challenge the disposition of any of his disciplinary hearings, this court has not viewed it as the exclusive means by which he may present his view of the constitutional and regulatory deficiencies in the disciplinary proceedings." [2] *Id.* We held that, "at least where the government seeks to rely upon decisions in the disciplinary process as a basis for its 'no-further-benefit' determination, the youth offender may raise in a hearing before the sentencing judge under D.C.Code § 24–805, any due process challenges to the validity of the disciplinary decisions." *Id.* at 432.

It is apparent at once that *Vaughn* does not support Coates's claim of a general right to sue under the LRAA. *Vaughn* dealt with the narrow question of whether "in a hearing before the sentencing judge under D.C.Code § 24–805," a prisoner can defeat a no-further-benefit determination by citing regulatory violations, at least those implicating constitutional due process. *Id.* at 432. Our affirmative answer to that question understood the right to make such challenges to be implicit in § 24–805 of the Youth Rehabilitation Amendment Act,[3] which permits a youth offender to appeal to the sentencing judge—and obtain a stay of—proposed action by prison officials based on the no-further-benefit finding. *See* § 24–805(a)(3) & (b). Our decision did not hold or suggest that the right derived from the LRAA itself. Coates cites no case of ours recognizing a general right of Lorton inmates to sue and seek "any available remedy," *Franklin*, 503 U.S. at 66, 112 S.Ct. 1028 (citation and internal quotation marks omitted), for violation of the LRAA.

 What our decisions have done is to construe the availability of habeas corpus to redress such violations somewhat broadly, recognizing that habeas corpus reaches "not only the fact but also the form of detention." *Abdullah v. Roach*, 668 A.2d 801, 809 (D.C.1995). Thus, in *Walton v. District of Columbia*, *supra* note 3, we held that habeas relief under D.C.Code § 16–1901(a) (1997) could embrace a request for a declaratory judgment that past administrative segregation had been unlawful and an order directing expungement of the disciplinary record. *See Walton*, 670 A.2d at 1352–53. Arguably, too, we have held that relief of that kind ancillary to the release from detention afforded by the "Great Writ" may be sought under the general civil jurisdiction of the Superior Court. *See id.* at 1353; *Abdullah*, 668 A.2d at 807. But we have never had occasion to consider whether the LRAA creates a private right of action for dam-

---

**2.** The court cited two previous decisions that involved similar challenges to no-further-benefit findings under the federal and local youth offender statutes. *See Vaughn*, 598 A.2d at 431–32.

**3.** *See Walton v. District of Columbia*, 670 A.2d 1346, 1353 n. 14 (D.C.1996) (pointing out that in *Vaughn* "the inmate raised his issue, regarding the Department's determination of 'no-further-benefit' from youth offender status, before the sentencing judge under D.C.Code § 24–805").

ages—essentially a tort remedy—for wrongful administrative segregation. To that issue of first impression we now turn.

In *In re D.G., supra,* the court recognized that only three of the four factors listed in *Cort v. Ash* are relevant to the question whether a state law creates an implied cause of action:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ... ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*In re D.G.,* 583 A.2d at 166, quoting *Cort v. Ash,* 422 U.S. at 66, 95 S.Ct. 2080 (emphasis by the Supreme Court). The " 'ultimate issue' " is whether the legislature intended to create a particular cause of action, because "unless such '[legislative] intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.' " *Karahalios v. National Fed'n of Fed. Employees,* 489 U.S. 527, 532–33, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989) (citations omitted); *Twyman v. Johnson,* 655 A.2d 850, 857 (D.C.1995). The burden is on Coates to demonstrate that, in spite of the absence of any explicit authorization, the D.C. Council intended to imply a right to sue for damages for violations of the LRAA. *See Fountain v. Kelly,* 630 A.2d 684, 690 (D.C.1993) (citing *Suter v. Artist M.,* 503 U.S. 347, 363–64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)).

The District concedes that the Lorton regulations were promulgated for the special benefit of the inmates at Lorton, but argues that there is no evidence of the Council's intent to create a broad civil right of action and that, indeed, such a remedy would be inconsistent with the LRAA's purposes. Like the trial judge, we need not consider the third *Cort* factor because we agree with the government

that Coates cannot demonstrate a legislative intent to provide the remedy he desires.

The text of the LRAA, set out entirely above, contains no hint of how the Council of the District of Columbia intended the regulations to be enforceable judicially. On its face, the statute does no more than—importantly—exercise the Council's authority to approve the regulations which the Mayor had promulgated for the administration of discipline at Lorton. Moreover, as accurately summarized by Judge Burgess, the legislative history of the Act carries no suggestion of an intent to provide a cause of action for damages. He wrote:

> The regulations were agreed on as part of a settlement of a class action suit by prisoners against the Department of Corrections. After they were adopted, they were submitted to the Council by the Department of Corrections pursuant to one of its promises in the agreement. It was thought that the Council needed to approve the regulations under D.C.Code § 24–442 (1945), which gives the Department of Corrections the power to promulgate rules and regulations "with the approval of the Commissioners" [now the Council]. The Committee on the Judiciary did not see its role in approving the regulations as "amend[ing] current law or creat[ing] new law, but merely [as] the vehicle for the council to exercise its regulation-approval powers which it inherited from the pre-home Rule Council." Council of the District of Columbia, Report on Bill 4–351, the "Lorton Regulations Act of 1982", June 9, 1982, at 2 [hereafter Committee Report].

The Council's approval added to the force of law which the regulations have, *see Abdullah,* 668 A.2d at 805, but as Judge Burgess correctly reasoned:

> [W]hen undertaking the factual inquiry of discovering the intent of the Council in approving the regulations, it is signifi-

cant ... that the Council did not view itself as creating new law. It is difficult to discern an intent to create a statutory cause of action from action of a legislative body merely approving regulations that themselves say nothing about a cause of action.

As Judge Burgess pointed out, the regulations themselves lend no support to the cause of action Coates desires. Codified in 28 DCMR §§ 500 *et seq.*, they establish a comprehensive system for notice, hearing, resolution, and administrative review of recommendations for disciplinary segregation. Indeed, to the extent they allow for administrative appeal of segregation decisions, that tends to "support[ the opposite] conclusion that no right to enforcement by civil action for damages exists." *Brantley v. District of Columbia,* 640 A.2d 181, 184 (D.C.1994).[4] More importantly in the present context (where no administrative appeal was available from the Warden's erroneous decision to overrule the adjustment board), the regulations were adopted against the background of the District's habeas corpus statute, which by its terms and as historically understood "reaches any restraint upon 'lawful liberty.'" *Abdullah,* 668 A.2d at 808; *see id.* at 809 (citing pre-LRAA cases of this court and the D.C. Circuit Court of Appeals holding habeas relief available to test, *inter alia,* unlawful placement of prisoner "in a control cell"). "[I]t is not only appropriate but also realistic to presume that [the Council] was thoroughly familiar with these ... precedents ... and that it expected its enactment to be interpreted in conformity with them." *Cannon v. University of Chicago,* 441 U.S. 677, 699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Since the Council by clear implication understood habeas corpus to provide the remedy for wrongful administrative segregation, a court should be extremely reluctant "to devise different (and in this case more drastic) remedies" for breach of the regu-

lations. *McCulloch v. District of Columbia,* 685 A.2d 399, 403 (D.C.1996); *see also Twyman,* 655 A.2d at 857 ("We think it improbable that the legislature, having provided thus specifically for damages [awarded by an administrative agency], meant also to create a cause of action in court for civil damages without expressly having said so.").

Coates relies on *Kelly v. Parents United for the District of Columbia Schools,* 641 A.2d 159 (D.C.1994). But in that case we found an implied private right of action (and then one seeking only declaratory and injunctive relief) chiefly because the statute in question would have "provide[d] no means of enforcement whatsoever unless a private right of action [were] implied." *Id.* at 165. Similar reasoning explained our rejection in *Abdullah, supra,* of the District's broad contention that the LRAA provides *no* judicial review of inmate segregation orders. We pointed out that the actions of government agencies were presumptively subject to judicial review at common law, 668 A.2d at 807, and quoted the Supreme Court's rejection of the idea that an individual could lawfully be " 'left to the absolutely uncontrolled and arbitrary action of a public and administrative officer,' " without any relief from the courts. *Id.* at 807 n. 9 (citation omitted). *Cf. also District of Columbia v. The Sierra Club,* 670 A.2d 354, 359 (D.C.1996) (in light of strong presumption favoring judicial review, "[j]udicial reviewability of agency action does not depend on the creation of a private right of action in the statute sought to be enforced"). But recognition of the necessity for judicial review is a far cry from assuming, without clear indication in a statute or its history, that the legislature intended to create a general right to sue for money damages. *See Sanford v. Manternach,* 601 N.W.2d 360, 371 (Iowa 1999) (neither statute requiring establishment of inmate disciplinary guidelines nor post-

---

**4.** In *Brantley* the court assumed without deciding the "dubious proposition" that "a new tort, compensable by suit for money damages,

... could ever be created by a school board regulation." 640 A.2d at 184.

conviction relief statute impliedly created private cause of action for money damages).

Finally, as the District argues (and as Judge Burgess concluded), it is noteworthy that in enacting the LRAA the Council in fact considered the question of court review of the Lorton administrators' actions, and in doing so was emphatic that the hearings afforded prisoners were not to be construed as making the administrative proceedings "contested cases" subject to review in this court. *See* D.C.Code § 1–1509 (1999). The Committee Report stated:

> Besides there being no legal basis for providing "contested case" treatment for penal disciplinary hearings there is a practical barrier for providing appellate court review of these hearings, viz. There are approximately 7,000 hearing per year at Lorton.

Committee Report at 3, note 6. As Judge Burgess reasoned, "The Council's reluctance to allow appeals to the District of Columbia Court of Appeals because of the thousands of hearings held each year is some evidence arguing against a conclusion that, [at the same time, it] intended to confer an original cause of action [on] each prisoner who believed he had been aggrieved as a result of action at such hearings."[5]

For all of these reasons, Coates has failed to persuade us that either the LRAA or its underlying regulations provided a right to sue Warden Elzie for damages. The case might well be different had Coates advanced a claim of violation of the LRAA sufficient to meet the standards of 42 U.S.C. § 1983, *see Walton,* 670 A.2d at 1355–56; *see also Donahue v. Staunton,* 471 F.2d 475 (7th Cir.1972) (recognizing right to money damages under 42 U.S.C.

§ 1983), but Coates, although having made such a claim initially, later abandoned it.

The decision of the Superior Court is, therefore,

*Affirmed.*

---

**5.** In this connection, the District also points to the conclusion in the Committee Report that enactment of the LRAA would "have no negative fiscal impact upon the District of Columbia." Committee Report at 3. Although it is not wholly implausible that before reaching that conclusion the Council gave thought to the prospect of suits for damages by prisoners aggrieved by the outcome of the "approximately 7,000 hearings per year," it is unnecessary for us to assess the support which the fiscal impact statement provides for the District's position.