2001 ND 116

**TRADE 'N POST, L.L.C., Plaintiff**

v.

**WORLD DUTY FREE AMERICAS, INC., and Ammex Tax & Duty Free Shops West, Inc., Defendants.**

No. 20000176.

Supreme Court of North Dakota.

June 14, 2001.

W. Todd Haggart (argued), Vogel, Weir, Hunke & McCormick, Ltd., Fargo, for plaintiff.

David J. Wallace–Jackson (appeared), Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for plaintiff.

Charles A. Gilman (argued), S. Penny Windle (appeared), and Kevin J. Burke, Cahill Gordon & Reindel, New York, NY, for defendants.

Stephen W. Plambeck (appeared), Nilles, Hansen & Davies, Ltd., Fargo, for defendants.

SANDSTROM, Justice.

[¶ 1] Invoking N.D.R.App.P. 47, the United States District Court, Northeastern Division for the District of North Dakota, has certified the following questions of law to this Court:

1) Does a private party have the right to bring an action for money damages for a violation of North Dakota's Unfair Discrimination Law (N.D.C.C. § 51–09) under the facts as alleged in Trade 'N Post's complaint?

2) Does a private party have the right to bring an action for money damages for a violation of North Dakota's Unfair Trade Practices Law (N.D.C.C. § 51–10) under the facts as alleged in Trade 'N Post's complaint?

3) Does North Dakota's common law recognize a claim for relief for wrongful interference with business under the facts as alleged in Trade 'N Post's complaint?

[¶ 2] We conclude there is no private right of action for damages under either the Unfair Discrimination Law or the Unfair Trade Practices Law, and we recognize a common law tort claim for unlawful interference with business.

I

[¶ 3] World Duty Free Americas, Inc., and Ammex Tax & Duty Free Shops West, Inc. (collectively referred to as "Ammex"), operate duty-free stores under the trade name "Ammex" at various locations around the country, including a location near the Canadian border crossing at Pembina, North Dakota. Trade 'N Post, L.L.C., is a North Dakota limited liability company that opened a competing duty-free store in

Pembina in 1998. Trade 'N Post alleges Ammex has engaged in anticompetitive and predatory behavior, including charging prices below cost, charging lower prices at its Pembina location than it charges for the same goods at its other North Dakota locations, pressuring major alcohol and tobacco suppliers not to sell their products to Trade 'N Post, and pressuring tour bus operators not to stop at Trade 'N Post's duty-free store.

[¶ 4] In 1999, Trade 'N Post brought suit against Ammex in federal district court, alleging violations of the state and federal antitrust acts, violation of the Unfair Discrimination Law, violation of the Unfair Trade Practices Law, and wrongful interference with business. The federal district court refused to exercise supplemental jurisdiction over the claims based upon the Unfair Discrimination Law, the Unfair Trade Practices Law, and wrongful interference with business, and dismissed those claims without prejudice. The antitrust claims proceeded to discovery.

[¶ 5] Trade 'N Post subsequently filed a complaint in state district court realleging the three dismissed claims. Ammex removed the state case to federal district court, thereby returning the three claims to the federal court, and the two pending actions were consolidated. Ammex moved to again dismiss the three claims, and Trade 'N Post moved for certification of questions of law to this Court. The federal district court granted the motion to certify questions to this Court under N.D.R.App.P. 47 by an order dated June 13, 2000.

[¶ 6] This Court has jurisdiction under N.D.R.App.P. 47.

## II

[¶ 7] Trade 'N Post argues this Court should recognize an implied private right of action for damages under the Unfair Discrimination Law, N.D.C.C. ch. 51–09, and the Unfair Trade Practices Law, N.D.C.C. ch. 51–10. We conclude there is no private right of action for damages under either chapter.

## A

[¶ 8] The Unfair Discrimination Law prohibits a company from selling identical products for different prices at different locations in the state, if done for the purpose of destroying a competitor's business:

Unfair discrimination in purchase and sale of commodities. Any person, firm, company, association, corporation, or limited liability company, foreign or domestic, doing business in this state and engaged in the production, manufacture, or distribution of any commodity in general use, that, for the purpose of destroying the business of a competitor in any locality, intentionally shall discriminate between different sections, communities, or cities of this state by selling such commodity at a lower rate in one section, community, or city than is charged therefor by said party in another section, community, or city, after making due allowance for the difference, if any, in the grade or quality and in the actual cost of transportation from the point of production, if a raw product, or from the point of manufacture, if a manufactured product, is guilty of unfair discrimination.

N.D.C.C. § 51–09–01. Violation of this provision is a class A misdemeanor. N.D.C.C. § 51–09–02. In addition, N.D.C.C. § 51–09–04 gives the attorney general broad authority to investigate suspected violations and to pursue civil remedies in the name of the State:

Authority of attorney general to investigate and prosecute unfair discrimination when complaint is made. If a complaint is made to the attorney general

that any person is guilty of unfair discrimination committed for any of the purposes enumerated in section 51–09–01, the attorney general shall investigate the matter complained of, and for that purpose the attorney general may subpoena witnesses, administer oaths, take testimony, and require the production of books or other documents belonging to the person complained against. If, in the attorney general's opinion, sufficient grounds exist therefor, the attorney general shall prosecute an action in the name of the state of North Dakota to annul the charter, if the person complained against is a corporation or limited liability company, or to revoke the permit or license of the person complained against.

[¶ 9] The Unfair Trade Practices Law prohibits the sale of goods below cost, if done with the intent to lessen competition, restrain trade, or create a monopoly:

> Unfair advertising, offer to sell, or sale. Any advertising, offer to sell, or sale of any merchandise, either by retailers or wholesalers, at less than cost as defined in this chapter, which has the intent or the effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor or otherwise injuring a competitor, impairs and prevents fair competition, injures public welfare, and is unfair competition and contrary to public policy and the policy of this chapter, where the result of such advertising, offer, or sale is to tend to deceive any purchaser or prospective purchaser, or substantially to lessen competition, or unreasonably to restrain trade, or to tend to create a monopoly in any line of commerce.

N.D.C.C. § 51–10–03. Violation of the Unfair Trade Practices Law constitutes a class A misdemeanor. N.D.C.C. § 51–10–05. The attorney general has broad investigatory powers under N.D.C.C. ch. 51–10. *See* N.D.C.C. §§ 51–10–05.1, 51–10–05.2, 51–10–05.3. Either the attorney general or any person injured by a violation of N.D.C.C. ch. 51–10 may sue for injunctive relief:

> Injunctional relief may be had in addition to other penalties—Duty to commence actions. In addition to the penalties provided in this chapter, the courts of this state are invested with the jurisdiction to prevent and restrain violations of this chapter by injunctional proceedings. The attorney general and the several state's attorneys shall institute suits in behalf of this state, to prevent and restrain violations of the provisions of this chapter. Any person damaged, or who is threatened with loss or injury, by reason of a violation of the provisions of this chapter, is entitled to sue for and have injunctive relief in the district court against any damage or threatened loss or injury by reason of a violation hereof.

N.D.C.C. § 51–10–06.

### B

[¶ 10] Trade 'N Post concedes these code provisions do not expressly provide a private action for damages. It argues, however, we should imply a private right of action for damages under both chapters.

[¶ 11] We have previously employed the four-part test enunciated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), when determining whether a private right of action should be implied under a federal statute. *See Kershaw v. Reichert*, 445 N.W.2d 16, 17 (N.D.1989); *Hillesland v. Federal Land Bank Ass'n*, 407 N.W.2d 206, 208 (N.D.1987); *R.B.J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n*, 315 N.W.2d 284, 287 (N.D.1982). The *Cort* test provides:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Hillesland,* 407 N.W.2d at 208 (quoting *Cort,* 422 U.S. at 78, 95 S.Ct. 2080).

[¶ 12] Although we have not previously addressed the issue, courts in other jurisdictions have applied the *Cort* test when determining whether there is an implied private right of action under a state statute. *See, e.g., Lock v. Schreppler,* 426 A.2d 856, 864 (Del.Super.Ct.1981), *superseded by statute on other grounds as stated in Eastern Commercial Realty Corp. v. Fusco,* 654 A.2d 833, 837 (Del.1995); *Coates v. Elzie,* 768 A.2d 997, 1001 (D.C.2001); *Sanford v. Manternach,* 601 N.W.2d 360, 371 (Iowa 1999); *Eason v. Independent Sch. Dist. No. 11,* 598 N.W.2d 414, 417 (Minn. Ct.App.1999); *Uhr v. East Greenbush Cent. Sch. Dist.,* 94 N.Y.2d 32, 698 N.Y.S.2d 609, 720 N.E.2d 886, 888 (1999); *Holbert v. Echeverria,* 744 P.2d 960, 963 (Okla.1987), *superseded by statute on other grounds as stated in Walls v. American Tobacco Co.,* 11 P.3d 626, 628 (Okla.2000); *United Steelworkers of America v. Tri State Greyhound Park,* 178 W.Va. 729, 364 S.E.2d 257, 259–60 (1987); *see also Dahl v. ConAgra, Inc.,* 998 F.2d 619, 621 (8th Cir. 1993) (predicting this Court would apply *Cort* factors recognized in *R.B.J. Apartments* to a state statute). Most states that have adopted the *Cort* test for determining whether to imply a private right of action under a state statute have deleted the fourth *Cort* factor, because it does not apply in the state law context. *See, e.g., Lock,* 426 A.2d at 864; *Coates,* 768 A.2d at 1001; *Eason,* 598 N.W.2d at 417; *Uhr,* 698 N.Y.S.2d 609, 720 N.E.2d at 888; *Holbert,* 744 P.2d at 963. As the court explained in *Lock,* 426 A.2d at 864, it is appropriate to "[e]liminate[e] the fourth consideration of the *Cort* test as inapplicable to the consideration of whether a state statute infers a cause of action, since it arises from the basic principle of federalism which accords deference to the states in those areas customarily regulated by them and is founded on a recognition that Congress would not intend to create by implication a private cause of action which would constitute a new federal right in an area of the law traditionally regulated by the states."

[¶ 13] We conclude the first three *Cort* factors provide an appropriate analysis for determining whether to imply a private right of action under a state statute. The theory of implied private actions is basically a matter of statutory construction, and the question whether a statute creates a private right of action is ultimately one of legislative intent. *R.B.J. Apartments,* 315 N.W.2d at 287. An implied private right of action must be within the statutory scheme to exist. *Werlinger v. Champion Healthcare Corp.,* 1999 ND 173, ¶ 42, 598 N.W.2d 820. The "ultimate issue" is whether the legislature intended to create a particular cause of action, and "unless this [legislative] intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Thompson v. Thompson,* 484 U.S.

174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (quoting *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)); *see also Coates*, 768 A.2d at 1001. The United States Supreme Court has recognized "the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (citation omitted). Because the first three *Cort* factors are merely a specialized application of traditional canons of statutory construction, we consider those factors, as enunciated and applied in our prior caselaw, when determining whether a private right of action should be implied under a state statute.

## C

[¶ 14] The legislature's silence in failing to expressly provide a private right of action is a strong indication it did not intend such a remedy. *See Touche Ross*, 442 U.S. at 571, 99 S.Ct. 2479; *R.B.J. Apartments*, 315 N.W.2d at 289. The party urging an implied right of action therefore bears the burden of proof to establish the legislature intended to create the remedy. *Suter v. Artist M.*, 503 U.S. 347, 363–64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Thus, Trade 'N Post must demonstrate, through the language and focus of the statute, the legislative history, or the statutory purpose, that the legislature intended to create a private right of action for damages under N.D.C.C. chs. 51–09 and 51–10. *See R.B.J. Apartments*, 315 N.W.2d at 287.

### 1

[¶ 15] Trade 'N Post argues it is within the classes of persons the statutes were intended to protect-competitors of offending businesses. The primary purpose of both the Unfair Discrimination Law and the Unfair Trade Practices Law appears to be protection of the public from the effects of anticompetitive business practices. Competitors of the offending businesses may be secondary beneficiaries under the statutes. As the Court noted in *R.B.J. Apartments*, 315 N.W.2d at 288:

> The fact that borrowers may suffer "special injury" by violation of these statutes, however, does not necessarily make them members of a class for whose especial benefit the statute was enacted.... The mere fact that these statutes have been violated ... does not automatically give rise to a private cause of action in R.B.J.'s behalf.

Even if Trade 'N Post is a member of a class for whose benefit the statute was enacted, that is merely one factor in the equation. Trade 'N Post must still establish, upon consideration of all relevant factors, the legislature intended to create a private right of action for damages under N.D.C.C. chs. 51–09 and 51–10.

### 2

[¶ 16] Trade 'N Post has failed to draw our attention to anything in the language of the statutes or the legislative history that indicates the legislature intended to provide a private right of action for damages for violations of N.D.C.C. chs. 51–09 or 51–10. Rather, the statutory scheme strongly supports the conclusion the legislature did not intend such a remedy.

[¶ 17] When a statute expressly includes a comprehensive regulatory scheme, it is a strong indication the legislature did not intend to provide other remedies:

> The structure of these statutes similarly counsels against recognition of an implied right of action in this case. The

language of the statutes entrusts enforcement of the statutory requirements to the appropriate [regulatory] agencies.... The comprehensive character of a remedial scheme expressly fashioned by [the legislature] strongly evidences an intent not to authorize other remedies. It is not within the competence of the judiciary to amend these comprehensive enforcement schemes by adding to them another private remedy not authorized nor intended by [the legislature].

*R.B.J. Apartments,* 315 N.W.2d at 288–89 (citation omitted); *see also Dahl,* 998 F.2d at 622 ("the implication of a private right of action ... where the legislature has provided a comprehensive regulatory scheme and has not explicitly provided such an action, would be an intrusion on the [Public Service Commission's] regulatory authority").

[¶ 18] Both the Unfair Discrimination Law and the Unfair Trade Practices Law include comprehensive regulatory schemes and give the attorney general broad investigatory and enforcement powers over violations of the statutes. *See* N.D.C.C. §§ 51–09–04, 51–09–05, 51–09–06, 51–10–05.1, 51–10–05.2, 51–10–05.3, 51–10–06. The attorney general may investigate complaints under the statutes, issue subpoenas, examine or impound records, documents, and merchandise, and commence actions for injunctive relief or to revoke the charter, permit, or license of the violator. In addition, violation of either chapter is a criminal offense. *See* N.D.C.C. §§ 51–09–02, 51–10–05.

[¶ 19] These are not statutes that create rights without providing an enforcement mechanism. Rather, the legislature has expressly provided extensive civil and criminal remedies for violations of the statutes, and aggrieved parties may file complaints with the attorney general or the secretary of state to trigger an investigation. *See* N.D.C.C. §§ 51–09–04, 51–09–06. The legislature has provided specific methods for aggrieved parties to participate in enforcement of violations of N.D.C.C. chs. 51–09 and 51–10.

### 3

[¶ 20] One additional provision in the Unfair Trade Practices Law militates strongly against an implied right of action for damages. Section 51–10–06, N.D.C.C., expressly provides for a private right of action for injunctive relief:

> Any person damaged, or who is threatened with loss or injury, by reason of a violation of the provisions of this chapter, is entitled to sue for and have injunctive relief in the district court against any damage or threatened loss or injury by reason of a violation hereof.

Under similar circumstances, the court in *Massachusetts Candy & Tobacco Distrib., Inc. v. Golden Distrib., Ltd.,* 852 F.Supp. 63, 70 (D.Mass.1994), stated:

> [I]t is unlikely that plaintiffs may sue for damages for defendant's alleged violation of either the Unfair Sales Act or the Cigarette Act. Certainly, there is no express right of action to sue for damages. Nor can it be said that such right arises by clear implication of either statute. In fact, the clearest implication is that there is no such right. The Unfair Sales Act expressly provides for the right to sue for injunctive relief only.... Where a statute expressly provides for a private right of action that does not include a damages remedy, it is difficult to draw any conclusion other than that the limited remedy provided by the legislature is the only one it intended to create.

By creating a private right of action for injunctive relief, but not for damages, the legislature has clearly expressed its intent not to create a private remedy for dam-

ages. In construing statutes, this Court has recognized the maxim *expressio unius est exclusio alterius*: "[T]he mention of one thing implies the exclusion of another." *Dixon v. Kaufman*, 79 N.D. 633, 643, 58 N.W.2d 797, 803 (1953).

#### 4

[¶ 21] Further support for our conclusion arises from a review of N.D.C.C. chs. 51–09 and 51–10 within the context of the entire statutory scheme. *See Dahl*, 998 F.2d at 622 ("a particular section is best construed in light of, with reference to, or in connection with an entire statutory scheme"). Statutes should be read in relation to other statutes involving the same or similar subject matter in an attempt to discern legislative intent. *Johnson v. Johnson*, 527 N.W.2d 663, 668 (N.D.1995); *Kroh v. American Family Ins.*, 487 N.W.2d 306, 308 (N.D.1992).

[¶ 22] The chapter in the Century Code immediately preceding the Unfair Discrimination Law and the Unfair Trade Practices Law is N.D.C.C. ch. 51–08.1, the Uniform State Antitrust Act. The provisions of the Antitrust Act are in many respects similar to, and overlap, the Unfair Discrimination Law and the Unfair Trade Practices Law. *See* N.D.C.C. §§ 51–08.1–02, 51–08.1–03. In fact, the same conduct by Ammex that Trade 'N Post relies upon as the basis of its claims under the Unfair Discrimination Law and the Unfair Trade Practices Law also provides the basis for Trade 'N Post's claims in its action under the Antitrust Act.

[¶ 23] The Antitrust Act explicitly provides a private right of action for injunctive relief and damages, including costs, attorney fees, and treble damages. N.D.C.C. § 51–08.1–08(2). We believe it is significant the legislature has, in consecutive chapters dealing with related subject matter, expressly provided a cause of ac-

tion for injunctive relief and damages under the Antitrust Act, expressly provided an action for injunctive relief but not damages under the Unfair Trade Practices Law, and provided no private right of action under the Unfair Discrimination Law. The express inclusion of a private right of action for damages in the Antitrust Act indicates the legislature knew how to create such a remedy if that was its intent. *See State ex rel. Kusler v. Sinner*, 491 N.W.2d 382, 388 (N.D.1992); *Mid–America Steel, Inc. v. Bjone*, 414 N.W.2d 591, 596 (N.D.1987); *Hennum v. City of Medina*, 402 N.W.2d 327, 332 n. 3 (N.D.1987). When a statute that fails to expressly provide a private right of action is flanked by a related statute that does expressly create such a remedy, it is an indication the legislature did not intend to create a private right of action by implication. *See Touche Ross*, 442 U.S. at 571–72, 99 S.Ct. 2479; *Dahl*, 998 F.2d at 622.

#### 5

[¶ 24] Trade 'N Post has also failed to provide authority from other jurisdictions that would support an implied right of action under these circumstances. The parties have cited statutes from numerous other jurisdictions that are similar to the Unfair Discrimination Law and the Unfair Trade Practices Act. Trade 'N Post has not cited a single decision finding an implied private right of action under those similar statutes.

#### 6

[¶ 25] Trade 'N Post argues we should recognize a private right of action under the Unfair Discrimination Law and the Unfair Trade Practices Law based upon the holding in *Fargo Women's Health Org., Inc. v. FM Women's Help and Caring Connection*, 444 N.W.2d 683 (N.D. 1989). Trade 'N Post contends the Court

in *Fargo Women's Health* recognized an implied private right of action under the False Advertising Act, N.D.C.C. ch. 51–12.

[¶ 26] Careful reading of *Fargo Women's Health*, however, yields two possible interpretations: the Court found an implied private right of action under the statute, or the Court recognized a common law tort and concluded a violation of the statute could establish the elements of that tort. The Court did not focus upon the legislature's express or implied intent to create an action for damages under the statute, but instead stressed "the role of the judiciary in the expression of law" and that " '[t]ort law is overwhelmingly common law, developed in case-by-case decisionmaking by courts.' " *Fargo Women's Health*, 444 N.W.2d at 684 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 3, at 19 (5th ed.1984)). *Fargo Women's Health* does not support implying a private right of action for damages in this case.

[¶ 27] The majority opinion in *Fargo Women's Health* is hardly a model of clarity, and on its face lends itself to differing interpretations: that the Court was creating a common-law tort for damages for false advertising, or that it was implying a private right of action under the statute.

[¶ 28] The majority in *Fargo Women's Health* never used the phrase "implied private right of action." Nor did the majority cite a single decision addressing the well-developed doctrine of implied private rights of action. The majority never acknowledged prior caselaw establishing the decision whether to find an implied private right of action under a statute is a matter of statutory construction, hinging upon legislative intent. *See R.B.J. Apartments*, 315 N.W.2d at 287; *see also Werlinger*, 1999 ND 173, ¶ 42, 598 N.W.2d 820.

[¶ 29] The *Fargo Women's Health* majority's reasoning is addressed entirely to the Court's authority to create the common law. In addition to beginning its analysis with the observation "[t]ort law is overwhelmingly common law, developed in case-by-case decisionmaking by courts," the majority next stressed "violation of a statute or ordinance may be considered as evidence of negligence." *Fargo Women's Health*, 444 N.W.2d at 685 (quoting *Keyes v. Amundson*, 391 N.W.2d 602, 608 (N.D. 1986)).

[¶ 30] In concluding an action for damages was an appropriate remedy, the majority relied upon its determination there were strong public policy reasons favoring such a remedy. *See Fargo Women's Health*, 444 N.W.2d at 685. Consideration of public policy is appropriate only if the Court is determining whether to create a separate, common-law tort. If it is merely deciding whether an implied private right of action exists under the statute, it may only consider whether the legislature intended such a remedy, not whether in the Court's view a particular result is better from a policy standpoint. *See Werlinger*, 1999 ND 173, ¶ 42, 598 N.W.2d 820; *R.B.J. Apartments*, 315 N.W.2d at 287, 289. To the extent that *Fargo Women's Health* held an implied private right of action under the statute, it is overturned.

### D

[¶ 31] In reaching the conclusion there is no implied private right of action for damages under the Unfair Discrimination Law or the Unfair Trade Practices Law, we recognize the limitations placed upon courts by the separation-of-powers doctrine:

In implying a private cause of action, the court must be cognizant of the separation-of-powers doctrine. Our constitutional obligations prevent us from pro-

viding a cause of action significantly broader than the remedy [the legislature] intended to provide. The implication of a private right of action on the basis of [legislative] silence in this instance would, at best, be an unwarranted intrusion upon the legislative domain. *R.B.J. Apartments,* 315 N.W.2d at 289. The question for this Court is not whether we believe an action for damages for violation of the statute is appropriate. We "will not engraft a remedy on a statute, no matter how salutary, that [the legislature] did not intend to provide." *Thompson,* 484 U.S. at 187, 108 S.Ct. 513 (quoting *California v. Sierra Club,* 451 U.S. 287, 297, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). The sole question for this Court is whether the legislature intended to provide such a remedy. Trade 'N Post has failed to meet its burden of proving the legislature's intent to create a damages remedy, and we therefore conclude there is no implied private right of action for damages under N.D.C.C. chs. 51–09 or 51–10.

### III

[¶ 32] Trade 'N Post asks this Court to recognize the common law tort of unlawful interference with business under the facts alleged in its complaint-that Ammex allegedly "pressured" suppliers and tour bus operators to refuse to do business with Trade 'N Post. The nature of the "pressure" is not specified. We recognize the existence of the common law tort claim for unlawful interference with business and attempt to define its parameters within the context of this case.

### A

[¶ 33] We have previously recognized the closely related cause of action for tortious interference with an existing contract. *See, e.g., Messiha v. State,* 1998 ND 149, ¶ 10, 583 N.W.2d 385; *Tracy v. Central Cass Pub. Sch. Dist.,* 1998 ND 12, ¶ 9,

574 N.W.2d 781; *Fronteer Directory Co. v. Maley,* 1997 ND 162, ¶ 14, 567 N.W.2d 826. In *Bekken v. Equitable Life Assur. Soc.,* 70 N.D. 122, 153, 293 N.W. 200, 217 (1940), this Court explained:

> Wrongful interference with contractual rights, whether such interference induces or prevents a third person to refrain from forming a contract, or induces such person to break an existing contract, will render the person whose wrongful conduct is responsible for these results liable in damages to the party injured.

[¶ 34] Trade 'N Post concedes this Court has never expressly recognized the validity of a common law unlawful interference with business claim in this state, although we have discussed the tort on prior occasions. In *Fox v. Higgins,* 149 N.W.2d 369 (N.D.1967), the Court concluded the plaintiff had failed to plead and prove the elements of the tort:

> Our decision does not, as contended by the plaintiff, mean that no right of action exists in this State for interference with business or trade. All that we do hold is that the pleading of the plaintiff and the evidence which he produced in this case do not constitute or prove such a tort.

*Id.* at 372 (On Petition for Rehearing). Similarly, in *Schneider v. Schaaf,* 1999 ND 235, ¶¶ 25–28, 603 N.W.2d 869, we held, without expressly deciding the validity of the tort in this state, that the plaintiffs had failed to present any evidence of actual damages and therefore summary judgment dismissal of the claim was appropriate. The possible existence of the common law tort of wrongful interference with business was also recognized in a concurring opinion in *Fargo Women's Health Org., Inc. v. FM Women's Help and Caring Connec-*

*tion,* 444 N.W.2d 683, 687–88 (N.D.1989) (VandeWalle, J., concurring in result).

## B

[¶ 35] Wrongful interference with business is a recognized tort in nearly all American jurisdictions. *See* James O. Pearson, Jr., Annotation, *Liability For Interference With At Will Business Relationship,* 5 A.L.R.4th 9, § 2[a] (1981), and cases cited therein. We today join those jurisdictions, and recognize the existence of a tort action for unlawful interference with business in this State.

[¶ 36] There is great disparity in the language used by courts to describe the various elements of the tort. *See, e.g., McGreevy v. Daktronics, Inc.,* 156 F.3d 837, 841 (8th Cir.1998); *Pettit v. Paxton,* 255 Neb. 279, 583 N.W.2d 604, 609 (1998); *Landstrom v. Shaver,* 561 N.W.2d 1, 16 (S.D.1997); 45 Am.Jur.2d *Interference* § 48 (1999). We hold that, in order to prevail on a claim for unlawful interference with business, a plaintiff must prove the following essential elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted. *See, e.g., Wal–Mart Stores, Inc. v. Sturges,* 44 Tex.Sup.Ct.J. 486, No. 98–1107, 2001 WL 228139, at *1 (Tex. Mar.8, 2001); *see also Schneider,* 1999 ND 235, ¶ 26, 603 N.W.2d 869 (actual damages are an essential element of the tort).

## C

[¶ 37] In setting the parameters for the tort in this State, we recognize the wide divergence of opinions in other jurisdic-tions over the precise nature of "wrongful" conduct which will give rise to the tort. For example, in Texas alone, the courts have used a virtual laundry list of terms to describe the wrongful conduct which will give rise to the tort:

Texas, like most states, has long recognized a tort cause of action for interference with a prospective contractual or business relation even though the core concept of liability—what conduct is prohibited—has never been clearly defined. Texas courts have variously stated that a defendant may be liable for conduct that is "wrongful", "malicious", "improper", of "no useful purpose", "below the behavior of fair men similarly situated", or done "with the purpose of harming the plaintiff", but not for conduct that is "competitive", "privileged", or "justified", even if intended to harm the plaintiff. Repetition of these abstractions in the case law has not imbued them with content or made them more useful, and tensions among them, which exist not only in Texas law but American law generally, have for decades been the subject of considerable critical commentary.

*Wal–Mart,* 2001 WL 228139, at *1.

[¶ 38] Much of the debate in recent years has focused upon the necessity of establishing malice or ill will by the interferer, and upon whether the action complained of was justified or privileged. These conflicts have been created to a great degree by the close historical ties between the tort of interference with an existing contract and the tort of interference with prospective business advantage. For a thorough discussion of the historical underpinnings of these disputes, see *Wal–Mart,* 2001 WL 228139, at *4–5; *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 743–747 (1995); Dan B. Dobbs,

*Tortious Interference with Contractual Relationships*, 34 Ark.L.Rev. 335, 338–44 (1980); Donald C. Dowling, Jr., *A Contract Theory for a Complex Tort: Limiting Interference with Contract Beyond the Unlawful Means Test*, 35 Def. L.J. 503, 510–19 (1986); and Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 63–69 (1982).

[¶ 39] Particularly in the context of actions for wrongful interference with business brought against a competitor of the plaintiff, many courts and commentators have urged a decoupling of the two torts and, for wrongful interference with business, have suggested malice or motive of the interferer is irrelevant and liability should only be imposed if the interferer's conduct is independently tortious or unlawful. *See, e.g., Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 867 (7th Cir. 1999); *Della Penna*, 45 Cal.Rptr.2d 436, 902 P.2d at 750–51; *The Vikings, USA Bootheel MO v. Modern Day Veterans*, 33 S.W.3d 709, 711 (Mo.Ct.App.2000); *Wal–Mart*, 2001 WL 228139, at *8–12; Dobbs, *supra*, 34 Ark.L.Rev. at 347–50; Gary Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, 77 Minn.L.Rev. 1097, 1142–43 (1993); Perlman, *supra*, 49 U.Chi.L.Rev. at 78–99.

[¶ 40] The Supreme Court of California has provided a cogent analysis of the competing concerns:

In searching for a means to recast the elements of the economic relations tort and allocate the associated burdens of proof, we are guided by an overmastering concern articulated by high courts of other jurisdictions and legal commentators: The need to draw and enforce a sharpened distinction between claims for the tortious disruption of an *existing* contract and claims that a *prospective* contractual or economic relationship has been interfered with by the defendant. Many of the cases do in fact acknowledge a greater array of justificatory defenses against claims of interference with prospective relations. Still, in our view and that of several other courts and commentators, the notion that the two torts are analytically unitary and derive from a common principle sacrifices practical wisdom to theoretical insight, promoting the idea that the interests invaded are of nearly equal dignity. They are not.

The courts provide a damage remedy against third party conduct intended to disrupt an existing contract precisely because the exchange of promises resulting in such a formally cemented economic relationship is deemed worthy of protection from interference by a stranger to the agreement. Economic relationships short of contractual, however, should stand on a different legal footing as far as the potential for tort liability is reckoned. Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties.

A doctrine that blurs the analytical line between interference with an existing business contract and interference with commercial relations *less* than contractual is one that invites both uncertainty in conduct and unpredictability of its legal effect. The notion that inducing the breach of an existing contract is simply a subevent of the "more inclusive" class of acts that interfere with economic relations, while perhaps theoretically unobjectionable, has been mischievous as a practical matter. Our courts should, in short, firmly distin-

guish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant.

Beyond that, we need not tread today. It is sufficient to dispose of the issue before us in this case by holding that a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful "by some measure beyond the fact of the interference itself."

*Della Penna,* 902 P.2d 750–51 (quoting *Top Service Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365, 1371 (1978)).

[¶ 41]  Professor Myers has further expounded upon the rationale for abandoning malice and motive in favor of focusing upon the unlawful nature of the interferer's conduct:

With regard to tortious interference with prospective business relations ... the law already recognizes a right to compete for future business.  The inquiry into motive, however, should be eliminated whenever the defendant is a bona fide competitor of the plaintiff.  In such cases, although the defendant may have made a vindictive statement showing mixed motives, the defendant's right to compete vigorously should preclude a tort claim.  In every case, it would seem, a competitor would be motivated at least in part by economic self-interest when it interferes with a prospective business relationship.  As one court has observed, "A competitor has an absolute right to take away as much of the 'other fellow's' business as he can lawfully."

Myers, *supra,* 77 Minn.L.Rev. at 1142 (footnotes omitted) (quoting *C.R. Bard, Inc. v. Wordtronics Corp.,* 235 N.J.Super. 168, 561 A.2d 694, 697 (1989)).  Professor Myers concludes:

[A]lthough one who interferes with the stability of a contractual relationship may be seen as an interloper and possibly a tortfeasor, one who interferes merely with a "prospective business advantage" may be essentially a competitor.  In an economic system founded upon the principle of free competition, competitors should not be liable in tort for seeking a legitimate business advantage.

Myers, *supra,* 77 Minn.L.Rev. at 1121–22 (footnote omitted); *see also Wal–Mart,* 2001 WL 228139, at *4.

[¶ 42]  In the context of this case, involving a claim of interference by a business competitor, we agree with the growing body of cases which hold that, in order to recover for wrongful interference with business, the plaintiff must prove the defendant's conduct was independently tortious or otherwise unlawful.  *See, e.g., Speakers of Sport,* 178 F.3d at 867; *Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d at 751; *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind.Ct.App.2000); *McGeechan v. Sherwood,* 760 A.2d 1068, 1081 (Me.2000) (claimant must show either intimidation or fraud); *Berry & Gould, P.A. v. Berry,* 360 Md. 142, 757 A.2d 108, 113 (2000); *The Vikings,* 33 S.W.3d at 711.  We agree with the well-reasoned conclusion of the Supreme Court of Texas:

It appears that in most Texas cases in which plaintiffs have actually recovered damages for tortious interference with prospective business relations, the defendants' conduct was either independently tortious—in the four cases noted, defamatory or fraudulent—or in violation of state law.  For the same reasons

accepted by the Supreme Court of California in *Della Penna*, and by the Seventh Circuit in *Speakers of Sport*, and advanced by Professor Perlman and other legal commentators, we see no need for a definition of tortious interference with prospective business relations that would encompass other conduct. The historical limitation of the tort to unlawful conduct—"the actor's conduct was characterized by violence, fraud or defamation, and was tortious in character"—provides a viable definition and preserves the tort's utility of filling a gap in affording compensation in situations where a wrong has been done. The concepts of malice, justification, and privilege have not only proved to be overlapping and confusing, they provide no meaningful description of culpable conduct, as the *Restatement (Second) of Torts* concluded more than twenty years ago.

We therefore hold that to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful. By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort. Thus, for example, a plaintiff may recover for tortious interference from a defendant who makes fraudulent statements about the plaintiff to a third person without proving that the third person was actually defrauded. If, on the other hand, the defendant's statements are not intended to deceive, as in *Speakers of Sport*, then they are not actionable. Likewise, a plaintiff may recover for tortious interference from a defendant who threatens a person with physical harm if he does business with the plaintiff. The plaintiff need prove only that the defendant's conduct toward the prospective customer would constitute assault. Also, a plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful. Conduct that is merely "sharp" or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations, and we disapprove of cases that suggest the contrary. These examples are not exhaustive, but they illustrate what conduct can constitute tortious interference with prospective relations.

The concepts of justification and privilege are subsumed in the plaintiff's proof, except insofar as they may be defenses to the wrongfulness of the alleged conduct. For example, a statement made against the plaintiff, though defamatory, may be protected by a complete or qualified privilege. Justification and privilege are defenses in a claim for tortious interference with prospective relations only to the extent that they are defenses to the independent tortiousness of the defendant's conduct. Otherwise, the plaintiff need not prove that the defendant's conduct was not justified or privileged, nor can a defendant assert such defenses.

In reaching this conclusion we treat tortious interference with prospective business relations differently than tortious interference with contract. It makes sense to require a defendant who induces a breach of contract to show some justification or privilege for depriving another of benefits to which the agreement entitled him. But when two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privi-

leged in his pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable.

*Wal–Mart*, 2001 WL 228139, at *11–12 (footnotes omitted) (quoting Restatement (Second) of Torts § 766B cmt. b (1979)). The Texas court summarized its holding:

[W]e conclude that to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. By "independently tortious" we mean conduct that would violate some other recognized tort duty.... [B]y way of example, a defendant who threatened a customer with bodily harm if he did business with the plaintiff would be liable for interference because his conduct toward the customer—assault—was independently tortious, while a defendant who competed legally for the customer's business would not be liable for interference. Thus defined, an action for interference with a prospective contractual or business relation provides a remedy for injurious conduct that other tort actions might not reach (in the example above, the plaintiff could not sue for assault), but only for conduct that is already recognized to be wrongful under the common law or by statute.

*Wal–Mart*, 2001 WL 228139, at *1.

[¶ 43] We hold that, in order to recover in tort for unlawful interference with business for actions by a business competitor, the plaintiff must establish that the interfering conduct was independently tortious or otherwise in violation of state law.

## D

[¶ 44] The basis for Trade 'N Post's unlawful interference with business claim is the allegation Ammex pressured suppliers and tour bus operators to refuse to do business with Trade 'N Post. On the record in this case, we have been provided no details on the specific conduct and tactics employed by Ammex. Accordingly, we leave it to the federal district court to resolve the factual disputes and determine whether Ammex's conduct provides a basis for tort liability under the parameters set out in this opinion.

## IV

[¶ 45] We conclude there is no private right of action for damages under either the Unfair Discrimination Law or the Unfair Trade Practices Law, and we recognize a common law tort claim for unlawful interference with business.

[¶ 46] VANDE WALLE, C.J., and RUSTAD, D.J., NEUMANN and MARING, JJ.,

[¶ 47] GERALD H. RUSTAD, D.J., sitting in place of KAPSNER, J., disqualified.