**ROTEC INDUSTRIES, INC., an Illinois Corporation, Plaintiff,**

**v.**

**MITSUBISHI CORPORATION, a Corporation organized under the laws of Japan; Tucker Associates, Inc., an Oregon Corporation; and Garry Tucker, an individual, Defendants.**

**No. CIV 00–1394–KI.**

United States District Court, D. Oregon.

Feb. 1, 2002.

Jeffrey S. Love, Klarquist Sparkman Campbell Leigh & Whinston, LLP, Portland, OR, George P. McAndrews, Matthew G. McAndrews, Dean A. Pelletier, James R. Nuttall, Gerald C. Willis, McAndrews Held & Malloy, LTD., Chicago, IL, for Plaintiff.

Paul T. Fortino, Anne L. Nichol, Perkins Coie, LLP, Portland, OR, Michael O. Warnecke, Debra Rae Bernard, Mayer Brown & Platt, Chicago, IL, for Defendants.

## OPINION

KING, District Judge.

This action concerns the Three Gorges Dam project ("Project") on the Yangtze River in China. When completed, the Three Gorges Dam will be the largest hydropower project in the world. It is being built in multiple stages, beginning in 1993 with completion expected in 2009. Stage I of the Project involved excavating and diverting the Yangtze River into a side channel. It was completed in 1997. Stage II involves construction of a large portion of the main section of the dam. It requires the placement of a huge volume of concrete.

Plaintiff Rotec Industries, Inc. ("Rotec"), and defendant Mitsubishi Corporation competed for contracts awarded for the purchase of equipment to place concrete in Stage II of the Project. The equipment contracts were split between the two companies. Rotec's claims concern conduct leading up to the award of these contracts, allegedly including bribery in the form of monetary payments and a job offer made to a man on the Bid Evaluation Committee.

On September 14, 2001, I granted summary judgment against Rotec's RICO and Robinson–Patman Act claims and denied summary judgment against the claim for tortious interference with prospective economic advantage. I stated:

> The parties devoted their main efforts to extensive briefing of the federal statutory claims. They also relied on the assumption that if the federal claims failed, the state tort would also fail, and may not have raised all possible arguments against the tort.
>
> .    .    .    .    .
>
> I conclude that Rotec has raised a factual issue that it can prove all of these elements. In particular, the improper means could be satisfied by the single predicate act under the RICO analysis, the quality control job offer.

In a telephone conference, I invited defendants to file a second motion for summary judgment against the remaining claim, supported by more complete briefing. Although Rotec contends that the law of the case doctrine precludes me from taking a second look at the claim, I do not feel so constrained due to the lack of argument from any of the parties at the time of the original motion.

Before the court is defendants' motion for summary judgment on plaintiff's tortious interference with prospective economic advantage claim (# 71). For the reasons below, I grant summary judgment against the claim.

## FACTS

Many of these facts are taken from the evidentiary record filed with the original motion for summary judgment.

Plaintiff Rotec, based in Illinois, designs, manufactures, sells, leases, and services heavy construction machinery, including the Tower Belt, a crane-based concrete conveyor system. Defendant Mitsubishi Corporation, based in Japan, engages in construction projects but does not design or manufacture equipment. Mitsubishi teamed with CS Johnson, an American company, and Potain, a French company, on the Project. Defendant Garry Tucker is president of defendant Tucker Associates, Inc. (jointly, "Tucker defendants"), an engineering consulting company based in Oregon. Tucker Associates was a consultant to CS Johnson on the Project.

China Yangtze Three Gorges Project Development Corporation ("China Three Gorges Development") is the owner of the Project. China Resources National Corporation and China Resources Machinery Corporation, two separate corporations, are subsidiaries of China Resources (Holdings) Co., Ltd. All of these Chinese entities are owned in whole or in part by the Chinese government.

CS Johnson hired Arvin Yu, a Chinese national, to be its sales agent in China. Yu also traveled with Tucker in China to act as his interpreter. Tucker described Yu as CS Johnson's "eyes and ears in China," providing information on various construction projects that he received from the Chinese government and other sources.

Mitsubishi began pursuing sales at the Project in 1992. It supplied numerous types of construction equipment in Stage I, including excavators, dump trucks, passenger buses, and a concrete batching plant.

In 1994 during Stage I of the Project, Rotec supplied one Tower Belt and two cranes, as well as trucks, associated equipment, and spare parts.

Also in 1994 during Stage I of the Project, CS Johnson sold a concrete batching plant to the Project. Tucker was consulting for CS Johnson at that time. One of CS Johnson's contacts at China Three Gorges Development for the batching plant was Zhuang Ming Xiang, a member of the Bid Evaluation Committee. The Bid Evaluation Committee, made up of at least 60 people, was responsible for evaluating and comparing the bids for the Project, including the concrete conveyor systems to be purchased in Stage II.

In connection with the Stage I batching plant contract, CS Johnson needed a person to supervise the quality of the steel being fabricated in China. In early 1995, Zhuang Ming Xiang was critical of the CS Johnson design drawings made pursuant to the contract.

On June 8, 1995, Arvin Yu sent a fax to Tucker in which he relays a message from Ruan Guanghua, a senior consultant of China Three Gorges Development and member of the Bid Evaluation Committee, stating:

> I am working for review and revising the tendering documents on *Proposal Concrete Conveying System and Placement.*
>
> In the 3GPC working group, every one knows that C.S. Johnson will cooperate with Potain for now, no bad comment on CSJ but Mr. Zhuang Mingxiang, he complained and made bad words. "CSJ design drawings is delay and could not satisfy requirement, less details."
>
> I know that Mr. Zhuang Mingxiang hopes to take fabrication QC, but to quote price and sign official contract

with CSJ for him is dangerous. So, he will never quote price directly.

So, I think you should to close Zhuang's mouth with QC job, and the contract or agreement has to be through Third Party. It's safety for Zhuang. The high level leaders are impressed with Zhuang's comment, as he is Machinery Department Manager.

Bernard Decl. Ex. 39 (emphasis in the original)[1]. A few weeks later, Tucker, on behalf of CS Johnson, authorized Zhuang Ming Xiang to be its quality control representative on the batching plant contract.

Tucker testified they offered the CS Johnson quality control job to Zhuang Ming Xiang so that Zhuang Ming would stop being critical of CS Johnson. He also maintains that the job offer had nothing to do with the upcoming bids for the Stage II contracts.

Allen Seeland, former president of CS Johnson, stated in a declaration that CS Johnson understood at the time that offering the job would gain Zhuang Ming's support in the bidding negotiations on Stage II concrete construction, quite his criticism of CS Johnson's drawings for fabrication of the batch plant, and keep him from making negative comments about CS Johnson during contract negotiations for Stage II concrete construction. When asked about his declaration in a deposition, Seeland stated that he wanted to keep Zhuang Ming's "mouth shut" about the drawings but he did not think he could assist CS Johnson get a contract in Stage II.

In August 1995, China Three Gorges Development announced that it was soliciting bids for the Stage II concrete placement equipment for the Project.

Both Rotec and Mitsubishi submitted bids including schedules of proposed prices for the purchase of any quantity between one and seven units, with the price per unit decreasing as the number of units increases (a typical quantity discount).

On November 1, 1996, Rotec contracted with China Resources National to sell it three Tower Belts, two cranes, and associated equipment and services for a total contract price of $30,515,319.

In a contract dated December 16, 1996, Mitsubishi contracted with China Resources National to sell it two Top Belt systems, designed and manufactured by Potain and CS Johnson. The contract price, including associated equipment and services, was $17,825,190.

Also on December 16, 1996, Mitsubishi executed an addendum requiring it to pay 0.5% of the contract price, or $89,126, to China Resources National. The addendum requires the commission to be paid to the buyer's account in a bank in Hong Kong with an account name of China Resources Machinery. Shigeo Mizutani, the person in charge of Mitsubishi's Stage II construction efforts at the Project, executed the addendum on behalf of Mitsubishi. He testified that the commission was payment for China Resources National's services as a payment agent for China Three Gorges Development.

Tucker testified that there was talk of payment in the nature of bribes made by Arvin Yu but that he does not know of any payments made to anybody. He and Seeland told Arvin Yu that they would not be privy to any knowledge about what was going on after they sold equipment to Arvin Yu. He also testified:

On March 25, 1997, He Gong, a vice president of China Three Gorges Development, sent a letter to Alan Turley, the commercial attaché of the United States

---

**1.** I concluded previously that the fax is not inadmissible hearsay when offered to prove Tucker's state of mind prior to making the job offer.

Embassy in Beijing, China, in response to a letter the Embassy sent on Rotec's behalf concerning intellectual property rights. He Gong states (quoted verbatim):

1. The constructive plan for Lot 2 is a comprehensive plan which requires that different types of concrete placement equipment and various constructive methods should be envolved in Stage Two, including ROTEC equipments. So what Mr. Oury told you that we planned to use his equipments to pour all concrete of this Lot is not correct.

2. ROTEC equipments are good for certain sections of 3G dam, but they are not exclusive. Therefore after inviting bids worldwide and contract negotiations, we have chosen part of ROTEC equipments. We've also selected various types of equipments from other companies including some Chinese companies. Before that we purchased an equipment from ROTEC for test. Test result shows that this equipment has advantages and disadvantages. Especially ROTEC is an associative small enterprise and its equipments come out from combination of products made by different other companies. This explains that ROTEC equipments are expensive and that coordination between parts is poor, which has brought about many difficulties in erection and operation management. We have informed ROTEC of the problems above and expressed our wish that improvements should be made in the second phase contract and better equipments should be supplied. Of course we also wish that ROTEC will develop and prosper by its good reputation and good quality of equipments.

Bernard Supplemental Decl., Ex. 2 at 4–5.

## LEGAL STANDARDS

After a discussion with the attorneys at the oral argument, I informed them that I would treat the motions against all claims as motions for summary judgment.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.), *cert. denied,* 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

### I.  *Choice of Law*

Although arguments could be made that either Oregon, Illinois, or Chinese law applies to the remaining tort, none of the parties have done a choice of law analysis. Defendants believe that Chinese law applies and that none of their conduct violates Chinese law. To spare everyone from the more complicated analysis, however, defendants rely on Oregon law, under which Rotec's claim also fails, in defendants' opinion. Defendants contend that both Oregon and Illinois law are consistent on the points on which they base their arguments and cite cases from both jurisdictions. Rotec contends that its claim survives summary judgment under either Illinois or Oregon law. It does not address the possibility of applying Chinese law.

I would prefer to resolve this question prior to deciding whether claims should be

dismissed. Because Rotec does not argue for applying Chinese law, however, and I know of no relevant differences between Oregon and Illinois law, I will do the analysis under Oregon law.

## II. *Tortious Interference with Prospective Economic Advantage*

■ The elements of the tort of intentional interference with economic relations are: (1) the existence of a professional or business relationship, which could be a contract or a prospective economic advantage; (2) intentional interference with the relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

I will assume without deciding that Rotec could survive summary judgment on all of the elements except for the fifth, a causal effect between the interference and damage to the economic relationship. I will also assume that the improper means include at least the 0.5% commission payment and the quality control job.

■ Rotec argues causation based on the following evidence. China Resources National planned to buy five concrete conveyor systems. Only Rotec and defendants were bidding on that type of equipment. Prior to the concrete conveyor systems used during Stage II at the Project, Rotec was the only company in the world to have designed, manufactured, or sold that type of equipment. China Resources National purchased three of the units from Rotec and received an option to purchase the other two units from Rotec at a discount. The additional two units were purchased from defendants six weeks later. Based on this, Rotec contends that it has raised a factual issue that defendants' wrongful conduct influenced the purchase decision.

There is no evidence of how defendants' allegedly wrongful conduct affected China Resources National's purchase decisions. Backing up a few steps, there is no evidence of how the conduct affected the Bid Evaluation Committee, no evidence of what the Bid Evaluation Committee recommended, no evidence on who made the final decision, and no evidence on whether the final decision maker accepted the recommendation of the Bid Evaluation Committee. The required inference is too great to make.

Rotec relies on *Kalgaard v. Lindo Mar Adventure Club, Ltd.*, 147 Or.App. 61, 934 P.2d 637 (1997), and its statement that summary judgment is inappropriate if there are facts creating a plausible inference that a person's statements about his or her conduct are not true. *Id.* at 67, 934 P.2d 637. A person negotiating to buy a time-share resort ended negotiations after several conversations with one of the time-share members who was critical of the resort managers. The prospective purchaser stated that the member played no role in his rejection of the offer and that he relied on advice from his attorney and his wife. I distinguish *Kalgaard* from this action by the difference in how far the parties in the two cases had proceeded in their negotiations. In *Kalgaard*, the seller and purchaser had reached a tentative agreement and final papers were being drafted. In contrast, Rotec was nowhere near that far along in selling the additional units. Instead, it submitted bid prices for additional units, as all prospective bidders were instructed to do, and granted a 90–day option for an additional two units when it contracted for the sale of three units.

■ Rotec objects to the admission of the He Gong letter, contending that it is hearsay, written after the fact in response

to potential patent litigation, and inconsistent with China Three Gorges Development's actions. I believe the reason He Gong sent the letter, namely a reason unconnected to this litigation, bolsters the believability of the letter. It is only inconsistent with China Three Gorges Development's purchases if vendor decisions are made solely on price, which they are not. Concerning the hearsay objection, I conclude that the letter is sufficiently trustworthy to fall within the residual hearsay exception in Fed.R.Evid. 807. I also note that I do not base my analysis on this letter but view it more in the nature of corroboration of the lack of causation evidence.

Summary judgment is granted against the tortious interference with prospective economic advantage claim alleged against all defendants.

## CONCLUSION

Defendants' motion for summary judgment on plaintiff's tortious interference with prospective economic advantage claim (# 71) is granted. This action is dismissed with prejudice.