RDO FOODS CO., Plaintiff,

v.

UNITED BRANDS INTERNATIONAL,
INC., James A. Osgood, and Matthew
Osgood, Defendants.

No. A2–01–088.

United States District Court,
D. North Dakota,
Northeastern Division.

March 19, 2002.

John J. Petrik, H. Patrick Weir, Sr., Michael T. Andrews, Vogel Law Firm, Bismarck, ND, for plaintiff.

Edward F. Klinger, Bernard E. Reynolds, Gunhus Grinnell Klinger Swenson & Guy, Moorhead, MN, Kenneth C. Howell, Hawley Troxwell Ennis & Hawley, Boise, ID, for defendants.

## MEMORANDUM AND ORDER

WEBB, Chief Judge.

### I. Introduction

The Court has before it two motions. First, defendant Matthew Osgood has moved this court to dismiss the action against him for lack of personal jurisdiction (doc. # 5). Plaintiff RDO Foods Co. ("RDO") opposes dismissal (doc. # 21). The Court has reviewed the motion, the supporting and opposing briefs and affidavits, along with the entire file. For the reasons set forth below, the Court finds that RDO Foods Co. has made a *prima facie* showing of jurisdiction against Matthew Osgood, and the motion is therefore **DENIED** (doc. # 5).

Second, also before the Court is a motion by RDO to dismiss the counterclaims of defendants James A. Osgood and United Brands International, Inc. ("UBI"), and/or for summary judgment with respect to these claims (doc. # 32). Defendants oppose the motion (doc. # 42). As explained further below, this motion is **GRANTED IN PART**, and **DENIED IN PART**. (doc. # 32).

### II. Background

Plaintiff RDO Foods Co. ("RDO") is a North Dakota corporation. It operates a dehydrated potato flake plant in Grand Forks, North Dakota. On September 20, 1990, RDO and James Osgood entered into a management agreement by which Osgood would perform certain management responsibilities for RDO. The agreement provides for a management fee to be paid to Osgood via yearly payments at the end of each fiscal year, equal to 5% of the yearly net profit of RDO. The agreement further provides that any disputes with regard to the agreement will be governed by North Dakota law.

RDO also entered into a sales agency agreement with UBI on September 20, 1990. This agreement provided that UBI would serve as the agent for the worldwide sales of potato flake produced by the Grand Forks potato dehydrating facility. UBI is located in Idaho. James Osgood, a third defendant, owns and controls UBI. Matthew Osgood, a resident of Idaho, is the son of James Osgood and is employed by UBI.

Around February 2000, the relationship between James Osgood and RDO soured. As a result, RDO ceased doing business with UBI. RDO contends that after February 2000, Matthew Osgood solicited RDO's customers to purchase potato flake from other sources by exposing RDO's trade secrets and making untrue statement to RDO's customers.

Also around February 2000, RDO contacted the U.S. Attorney's Office for the District of North Dakota and the FBI, contending that UBI and James Osgood were skimming profits from it by failing to remit all proceeds from the sales of potato flake. An investigation was then commenced against UBI, James Osgood, and Matthew Osgood. No charges have been filed with respect to this investigation.

In March 2000, James Osgood brought suit against RDO in the District of Idaho, alleging breach of contract for amounts unpaid to him under the management agreement. He subsequently amended his complaint to include various tort-based claims, which generally allege harm to his business reputation as a result of the FBI investigation.

RDO then brought suit in July 2001 against UBI, James Osgood, and Matthew Osgood in the District of North Dakota. RDO's suit against Matthew Osgood is based on its claim that he had disclosed RDO's trade secrets and tortiously interfered with RDO's business relationships.[1] In addition to the claims against Matthew Osgood, RDO alleges several claims against James Osgood and UBI, none of which are at issue here. James Osgood then interposed seven counterclaims; these counterclaims are identical to his claims in the District of Idaho. UBI interposed four counterclaims. Upon a motion

by RDO, Osgood's Idaho claim has been transferred to this Court.

Matthew Osgood has moved for dismissal for lack of subject matter jurisdiction. RDO has moved for dismissal under Rule 12(b)(6), and alternatively for summary judgment on the counterclaims interposed by James Osgood and UBI.

### III. Motion to dismiss for lack of personal jurisdiction

The Court will begin by addressing Matthew Osgood's motion to dismiss for lack of personal jurisdiction. Matthew Osgood ("Osgood") argues that he is not subject to jurisdiction here, claiming that: (1) he had no contacts with North Dakota during the time period alleged in the Complaint; and (2) he has not directed his allegedly tortious conduct towards North Dakota. RDO claims, however, that Osgood is subject to jurisdiction because he had sufficient contacts with North Dakota prior to termination of the sales agency agreement, and further, his conduct was sufficient to satisfy the *Calder* effects test.

#### A. *Personal jurisdiction standard*

■ "To survive a motion to dismiss for lack of personal jurisdiction, [RDO] need only make a *prima facie* showing of personal jurisdiction over [Osgood]." *Digi–Tel Holdings, Inc. v. Proteq Telecomm., Ltd.*, 89 F.3d 519, 522 (8th Cir.1996). In examining the *prima facie* showing, this Court must view the evidence in the light most favorable to RDO, and it must resolve all factual conflicts in RDO's favor. *Id.*

■ This Court may assert personal jurisdiction over Matthew Osgood if: (1) North Dakota's long-arm statute is satis-

---

[1] RDO was allowed to amend its complaint to add two claims against Matthew Osgood. By these claims, RDO additionally asserts that prior to February 2000, Matthew Osgood made false representation to certain European customers of RDO (doc. # 29).

fied; and (2) the exercise of jurisdiction does not violate the due process clause of the Fourteenth Amendment. *Guinness Import Co. v. Mark VII Distrib., Inc.*, 153 F.3d 607, 613–14 (8th Cir.1998). North Dakota's long-arm statute has been interpreted to permit the exercise of personal jurisdiction to the fullest extent permitted by due process. *Hebron Brick Co. v. Robinson Brick & Tile Co.*, 234 N.W.2d 250, 255–56 (N.D.1975). Thus, this Court is constrained only by the dictates of due process.

■ The due process clause limits the ability of a forum state to assert personal jurisdiction over a nonresident defendant. *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 373 (8th Cir.1990). Before the exercise of personal jurisdiction is proper, due process requires that Osgood have "minimum contacts" with North Dakota such that the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." Guinness Import, 153 F.3d at 614 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "The nonresident defendant's conduct and connection with the forum state must be such that 'he should reasonably anticipate being haled into court there.' " *Id.* (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In examining "minimum contacts," it is essential that "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Above all, the "minimum contacts" must not be random, fortuitous, attenuated, or the result of unilateral activity of a third party. See *id.*

■ After it is determined that the defendant purposefully established minimum contacts with the forum state, it must still be determined whether the exercise of personal jurisdiction over the defendant comports with "fair play and substantial justice." *Id.* As set out by the Eighth Circuit, the factors to consider include: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." *Id.* The first three factors are of primary importance, and the last two are of secondary importance. *Id.* In the Eighth Circuit, the "minimum contacts" determination and the "fair play and substantial justice" determination have been collapsed into one, with the five-factor analysis answering both inquiries. See, e.g., *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas*, 51 F.3d 1383, 1388–89 (8th Cir.1995); *Drayton Enters., L.L.C. v. Dunker*, 142 F.Supp.2d 1177, 1183–86 (D.N.D.2001).

## B. *Analysis*

■ The first two factors, the nature and quality of the contacts and the quantity of the contacts, weigh in favor of jurisdiction. The undisputed facts, as presented by RDO, tend to show that Osgood was actively engaged with the business operations of RDO Foods. He traveled to the RDO plant in Grand Forks one to two times per year beginning in 1996; he called Carl Johnson, plant manager of the Grand Forks plant, several times; his assistant spoke to Ron Miller, RDO operation manager, almost daily on Osgood's behalf; and "[h]e directed production at the plant as it related to certain RDO Foods customers." (Johnson Aff. at 2.) These contacts demonstrate that Osgood purposefully availed himself of the privi-

lege of conducting activities within North Dakota.

■ The third factor, which is the relationship of the cause of action to the contacts, is not only a factor in determining whether there is jurisdiction, but it also determines whether jurisdiction is specific or general. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432 n. 4 (8th Cir.1995). "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose." *Id.* RDO asserts that the court has both specific and general jurisdiction over Matthew Osgood. RDO submits, however, that the Court need not proceed further if it finds that Osgood is subject to specific jurisdiction. Given this statement and considering that RDO has clearly emphasized specific jurisdiction, the Court will proceed with a specific jurisdiction analysis.

Due process is satisfied for the exercise of specific jurisdiction "if the defendant has purposely directed its activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities." *Guinness Import*, 153 F.3d at 614. Osgood argues that he had no direct contact with North Dakota after February 2000, the period of time when the alleged causes of action arose. Thus, Osgood alleges that since he had no direct contact with the State of North Dakota when the causes of action arose, jurisdiction is inappropriate.

While the affidavits generally seem to support Osgood's contention, the Court finds that, at the very least, the affidavits support a finding that the alleged tortious activity arose out of Osgood's pre-February 2000 contacts with North Dakota. By calling managers of the RDO plant and visiting the plant, Osgood was fostering a relationship with RDO that would enable him to gain trade secrets and gain knowledge of RDO's business operations. *Cf. Northrup King Co.*, 51 F.3d at 1388–89 (finding personal jurisdiction appropriate by concluding that although some contacts by the non-resident defendant with the forum state "had nothing to do with the subject matter of the litigation," the contacts were nonetheless "an essential part of the course of dealing between the two companies and served to foster a continuation of the business relationship"). Thus, the Court concludes that the litigation in this case arose out of Osgood's contacts with North Dakota. The three primary factors, then, weigh in favor of jurisdiction.[2]

The Court's consideration of the two secondary factors bolsters its conclusion that personal jurisdiction over Osgood is proper. First, North Dakota has an obvious interest in providing a local forum in which its residents may litigate claims against non-residents. *Northrup King Co.*, 51 F.3d at 1389. Second, a plaintiff normally is entitled to select the forum in which to litigate, and whatever inconvenience imposed upon Osgood in litigating here is at least equaled by the inconvenience RDO would suffer by being forced to litigate in Idaho. *Id.*

Based on the discussion above, it is determined that the Court has personal jurisdiction over Matthew Osgood. Therefore, the motion to dismiss defendant Matthew Osgood (doc. # 5) is **DENIED.**

2. Since the Court finds that Matthew Osgood had sufficient direct contacts with North Dakota, it need not proceed with a *Calder* effects test analysis. *Cf. Drayton* 142 F.Supp.2d at 1184 (finding no direct contacts and thus determining whether personal jurisdiction was appropriate pursuant to *Calder* ).

## IV. Dismissal/summary judgment motion

Having found that jurisdiction over Matthew Osgood is proper, the Court will address RDO's motion for judgment on the pleadings and/or summary judgment of the counterclaims asserted by defendants James Osgood and UBI. James Osgood asserts seven counterclaims against RDO, while UBI asserts four counterclaims. RDO seeks dismissal of all counterclaims. The Court will address each in turn.

### A. Dismissal/summary judgment standards

For purposes of a motion to dismiss the Court must accept factual allegations contained in the complaint as true and construe them in the light most favorable to the plaintiff. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.1998). A dismissal under Rule 12(b)(6) is warranted when the complaint fails to state a claim upon which relief can be granted. The purpose of dismissal is "to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir.2001). Dismissal motions should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief. *Schmedding v. Tnemec Co.*, 187 F.3d 862, 864 (8th Cir.1999).

If, however, the Court determines that the counterclaims satisfy this threshold determination, that they are not fatally flawed in their legal premises, then the Court will review and consider matters outside of the pleadings to determine if the undisputed facts establish that RDO is entitled to summary judgment. The basic inquiry for purposes of summary judgment is "whether the evidence presents a suffi-cient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1025 (8th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### B. Breach of contract claim

■ By way of his first counterclaim, James Osgood alleges breach of contract, claiming that RDO has failed to pay him the management fee as contemplated by the management agreement. RDO argues that a breach, if it occurred, occurred at the end of fiscal year 1992; Osgood filed his counterclaim in 2001. As such, RDO asserts that this claim is barred by the statute of limitations, either by the two-year statute of limitations set forth in section 34–01–13 of the North Dakota Century Code, or alternatively by the six-year statute of limitations set forth in North Dakota Century Code, section 28–01–16(1).

Thus, the first issue before the Court is whether a two-year or six-year statute of limitations applies to the breach of contract claim. In making this determination, the Court is mindful of the North Dakota Supreme Court's preference for applying the longer term when there is a question of which statute of limitations to apply. 1990 N.D. Op. Atty. Gen. 57 (citing *In re W.M.V.*, 268 N.W.2d 781, 787 (N.D.1978)).

RDO contends that since James Osgood's breach of contract claim is essentially a wage claim, then the two-year statute of limitations applies pursuant to section 34–01–13 of the North Dakota Century Code. This section provides, in relevant part, as follows:

All suits and actions for the recovery of overtime, damages, fees or penalties accruing under laws respecting the payment of wages, and specifically under the Act of Congress known as the Fair

Labor Standards Act of 1938, as same has been or may hereafter be amended, and all other similar acts must be brought within two years after the accrual of such claim for relief.

An attorney general opinion, relied upon by RDO, explains that this statute does not apply to every single action involving wages; instead, it is limited to those actions "concerning recovery of unpaid minimum wages, unpaid overtime compensation, liquidated damages, fees, damages or penalties." 1990 N.D. Op. Atty. Gen. 57. Here, however, the action is not one for any of the above types of claims. Thus, the Court finds that the six-year statute of limitations controls. N.D. Cent.Code. § 28–01–16(1) (stating that an action upon a contract must be commenced within six years after the claim for relief has accrued).

■■■ Notwithstanding a decision by this Court that the six-year term applies, RDO argues that the limitations period has run since any putative breach occurred in 1992 [3] when Osgood was first entitled to receive payment under the management agreement. Thus, RDO contends, Osgood knew or should have known of his claim on that date. Contrarily, Osgood argues that the limitations period has not yet begun to run, contending that the contract was continuing and thus the statute of limitations period does not begin to run until the contract terminates.

■■■ In order to determine the accrual date for statute of limitations purposes, the Court must determine when the wrong, in this case a breach, occurred. *Osland v. Osland*, 442 N.W.2d 907, 908 (N.D.1989) ("Generally, the statute of limitations commences to run from the commission of a wrongful act giving rise to the cause of action."). RDO seemingly contends that the alleged breach occurred in 1992, the

first year in which Osgood did not receive payment as contemplated in the management agreement; thus, under this view, every subsequent year in which he did not receive payment constituted a continuing effect of the initial breach.

To support its argument, *RDO relies on Snortland v. State Dep't Pub. Instruction*, 615 N.W.2d 574, 577 (N.D.2000). In this case, a retired superintendent brought a breach of employment contract action against the state in 1998, arguing that his retirement benefits were incorrectly calculated. The North Dakota Supreme Court held that his claim was barred by the statute of limitations since the breach of contract accrued when he received his first retirement check in 1981. In reaching this holding, the North Dakota Supreme Court found that the superintendent reasonably should have known of or discovered his potential claim in 1981 when he received his first check.

RDO contends that *Snortland* is directly on point with the circumstances presented here, arguing that Osgood should have known of the breach in 1992. This reliance, however, is misplaced. The Court agrees with Osgood's assessment that the breach in *Snortland* was a single, one-time event, that event being the failure "to properly and accurately report [his] compensation to the appropriate state agency responsible for determining and paying the retirement benefits." *Id.* at 577. Every payment after this event was merely the "resulting injury" of the initial "wrongful act." *Id.*; accord *Brown Park Estates–Fairfield Dev. v. United States*, 127 F.3d 1449, 1456–57 (Fed.Cir.1997) (making a distinction between a single wrong which has continuing effects and a series of independent, distinct wrongs).

Osgood, on the other hand, seems to argue that the breach, which began in

**3.** Osgood argues that the first breach oc- curred in 1991.

1991, is still occurring, and that the limitations period does not start to run until the management agreement is terminated. In reaching this conclusion, Osgood relies on *S.T. Hudson Eng'rs v. Camden Hotel Dev.*, 747 A.2d 931, 934 (Pa.Super.Ct.2000), which stated that "[w]hen the contract is continuing, the statute of limitations runs from the time when the breach occurs or when the contract is in some way terminated." For this proposition, the court relied on its earlier case, *Thorpe v. Schoenbrun*, 202 Pa.Super. 375, 195 A.2d 870, 872 (1963). In *Thorpe*, the court explained when the continuing contract doctrine is applicable:

> On a continuing contract which is entire, the statute of limitations begins to run only from the time when the breach occurs or the contract is in some way terminated. The test of continuity, so as to take the cause out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, *with no definite time fixed for payment*, or were rendered under several separate contracts.
>
> 'If services are rendered under an agreement *which does not fix any certain time for payment* or for the termination of the services, the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties.'

*Id.* (emphasis added) (citation omitted). By this plain language, then, the continuing contract doctrine, as explained in *Thorpe*, is not applicable, since the management agreement clearly provided for payment at a fixed date, at the end of each fiscal year.

The Court, having considered both arguments, finds that a compromise position between the two arguments is correct and in conformance with other courts considering similar arguments. The wrong that occurred was neither a single wrong with continuing effects as in *Snortland*, nor was it a wrong that is still continuing as in *S.T. Hudson Eng'rs*. Rather, a wrong occurred each time RDO failed to pay the management fee as determined by the formula set forth in the management agreement.

 The management agreement in this case is similar to an installment contract; there is no fixed payment to be paid out over time, instead, each payment is separate and distinct from the others, each requiring a separate calculation. *Cf. Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1320–21 (9th Cir.1998). Thus, as with installment contracts, the Court finds that each year Osgood was not paid according to the terms of the management agreement, a new cause of action for breach of contract arose, each with its own statute of limitations period. *See id.* at 1321 ("[E]ach breach [of an installment contract] starts the clock afresh for statute of limitations purposes."); *C–B Realty & Trading Corp. v. Chicago & N.W. Ry. Co.*, 289 Ill.App.3d 892, 225 Ill.Dec. 59, 682 N.E.2d 1136, 1141 (1997); *H.J. Tucker & Assoc. v. Allied Chucker & Eng'g Co.*, 234 Mich.App. 550, 595 N.W.2d 176, 183 (1999); *Hart v. Int'l Tel. & Tel. Corp.*, 546 S.W.2d 660, 662 (Tex.Civ.App.1977). Accordingly, RDO's motion for dismissal is **GRANTED** with respect to alleged breaches occurring outside of the statute of limitations period, which includes any breach occurring before March 13, 1994.[4] RDO's motion is

---

4. Osgood filed a Complaint in Idaho on March 13, 2000, thus, the applicable limitations period begins on March 13, 1994. By

dismissing claims accruing before 1994, the Court determines that the statute is not tolled by the discovery rule. The Court finds that,

**DENIED** with respect to breaches occurring within the six-year statute of limitations period.[5]

### C. N.D. Cent.Code § 34–14–01 et seq.

■ Osgood's second counterclaim seeks interest on unpaid past wages pursuant to chapter 34–14 of the North Dakota Century Code. Osgood argues that 34–01–13, which provides a two-year statute of limitations, does not apply to his claim. This assertion is, as plaintiff correctly points out, incorrect. The plain language of the statute provides that, "All suits and actions for the recovery of overtime, damages, fees or penalties *accruing under laws respecting the payment of wages* ... must be brought within two years after the accrual of such claim for relief." N.D. Cent.Code. § 34–01–13 (emphasis added). Osgood's claim is brought pursuant to Ch. 34, which is entitled "Wage Collection." It is hard to imagine a title which would more clearly spell out that Osgood's claim arises under a law respecting a payment of wages. Thus, the Court finds that any claim for interest which accrued prior to March 13, 1998, is **DISMISSED**. The practical effect of this finding is that Osgood may recover interest on the August 31, 1998 payment and every payment thereafter; Osgood is foreclosed from re-

covering interest on payments in August 31, 1997 and before.[6]

### D. Interference with contract

■ Osgood, for his fourth counterclaim, and UBI, for its first counterclaim, allege interference with contract.[7] The elements of interference with a contract are set forth in *Tracy v. Central Cass Pub. Sch. Dist.*, 574 N.W.2d 781, 783 (N.D. 1998): "The plaintiff must prove '(1) a contract existed; (2) the contract was breached; (3) the defendant instigated the breach; and (4) the defendant did so without justification.'" RDO argues that counterclaimants' claim fails as a matter of law because it fails to allege that RDO instigated the breach. Counterclaimants allege, however, that "RDO, its officers and agents, intending to harm James Osgood and United, undertook actions and representations intending to cause a breach of those contracts, and RDO's actions were unjustified." (Answer and Counterclaim ¶ 30.) This statement seems directly to allege that RDO instigated a breach. The Court thus agrees with counterclaimants that their claim sufficiently alleges interference with contract under the liberal pleading practice contemplated by the Federal Rules of Civil Procedure.

---

as a matter of law, Osgood should have reasonably determined that he had a claim on the dates that he should have received payment.

5. In a footnote to its statute of limitations argument, RDO argues that any claim for breach of the management agreement is barred by a waiver. (RDO's Reply at 5, n. 3.) The concept of waiver is applicable in cases where the allegation is that a party delayed in enforcing contractual rights. *Pfeifle v. Tanabe*, 620 N.W.2d 167, 172 (N.D.2000). The Court finds that this doctrine is potentially applicable here. However, whether a waiver occurred is ordinarily a question of fact for the jury, *Gale v. North Dakota Bd. of Podiatric Med.*, 632 N.W.2d 424, 429 (N.D.2001), and it

does not change the Court's statute of limitations analysis.

6. As with the breach of contract claim, the Court determines that the statute is not tolled by the discovery rule. *See* note 4, *supra*.

7. The Court shall apply North Dakota law to this and all subsequent counterclaims, except for the defamation counterclaim, as explained below. The Court does so in order to simplify its task. Moreover, the Court finds that there is not a material difference between Idaho and North Dakota, and application of either to the tort counterclaims (except for the defamation counterclaim) would yield the same result.

RDO further argues that counterclaimants are precluded from asserting that RDO interfered with contracts for the sales of products manufactured by it. RDO argues that Osgood and UBI were acting on RDO's behalf when selling RDO products, and a principal may not be liable for contract interference when the agent makes the contracts on behalf of the principal. In support of its argument, RDO correctly cites the general rule that an agent may not advance a claim for tortious interference with contract when the "principal is overseeing contracts *made by the agent in the principal's behalf.*" *Cutter v. Lincoln Nat'l Life Ins. Co.*, 794 F.2d 352, 357 (8th Cir.1986) (emphasis added).

The Court finds, however, that counterclaimants raise a genuine issue of material fact as to whether the contracts that were interfered with were "made by the agent *in the principal's behalf.*" Counterclaimants assert that not all of the contracts at issue involved RDO product. Any contract involving non-RDO product was probably not made on RDO's behalf. As to the contracts involving RDO products, counterclaimants contend that these contracts belonged to UBI; many of the customers entering into these contracts did so prior to Osgood's and UBI's relationship with RDO. It is possible, then, that Osgood and UBI did not enter into the contracts on behalf of RDO but did so as part of a continuing business relationship. The Court thus finds that this claim survives dismissal and summary judgment.

### E. *Interference with prospective business advantage*

UBI's second counterclaim and Osgood's fourth counterclaim against RDO alleges interference with prospective business advantage. RDO contends that this claim fails since it fails to allege an interference with an identifiable third party. UBI and Osgood allege: "Osgood had a valid economic expectancy in the continuation of this relationship with RDO as sales agent ... RDO ... was aware of Osgood's economic expectancy, and through its actions and conduct ... intentionally interfered with such expectancy causing termination of such expectancy." In other words, as RDO points out, counterclaimants are essentially arguing that "RDO interfered with counterclaimants' expectation of continued business with ... RDO Foods."

North Dakota has recently recognized the tort at issue in *Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*, 628 N.W.2d 707 (N.D.2001). Here, the court set out the elements to satisfy such a claim:

(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.

*Id.* at 717. While North Dakota does not specifically provide that the interference must be with a third party, the Court can infer that such a requirement is necessary when examining the elements of the tort. The second element provides that the interferer must have knowledge of a valid business relationship or expectancy. This element would be superfluous if the interferer could be the same entity or person as the entity or person involved in the business relationship—naturally, a person or entity would already have knowledge of a business relationship of which he/she/it belonged. In addition, other cases defining the parameters of this tort require that the interference be with an identifiable *third* party. *See, e.g., Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir.

2002) (applying New York law); *Profile Prods., LLC v. Soil Mgmt. Techs., Inc.*, 155 F.Supp.2d 880, 885–86 (N.D.Ill.2001) (applying Illinois law); *Rotec Indus. Inc v. Mitsubishi Corp.*, 181 F.Supp.2d 1173, 1178 (D.Or.2002) (applying Oregon law); *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal.App.4th 1249, 116 Cal.Rptr.2d 358, 363 (2002); *Setliff v. Akins*, 616 N.W.2d 878, 898 (S.D.2000). RDO's motion to dismiss this claim is thus **GRANTED**.

F. *Intentional infliction of emotional distress*

 RDO contends that Osgood's sixth counterclaim, intentional infliction of emotional distress, should be dismissed, contending that Osgood failed to allege that any conduct on the part of RDO rose to the level of "extreme and outrageous," an essential element of the tort intentional infliction of emotional distress claim. Whether RDO's conduct may reasonably be regarded as so extreme and outrageous so as to permit recovery must initially be determined by the court as a matter of law. *Swenson v. Northern Crop Ins., Inc.*, 498 N.W.2d 174, 182 (N.D.1993). However, "where reasonable [people] may differ, it is for the jury, subject to the control of the ·court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.* The Court's inquiry is conducted on a case-by-case basis. *Id.* at 186.

The facts of the present claim, according to Osgood and UBI, are as follows. In November 1999, Osgood became aware that Ronald Offutt, a shareholder in RDO, was under considerable business pressure because of worsening financial conditions. (UBI and Osgood's Statement of Material Facts, doc. # 41 at 2.) Thus, Osgood anticipated that Offutt wished to remove him from his position as a shareholder. (*Id.* at 3.) Osgood also anticipated that the shareholders would likely utilize the "Texas Shootout Provision" contained in the shareholder agreement, which allowed them to force a buyout of his ownership. (*Id.*) In February 2000, representatives of RDO traveled to Boise to meet with Osgood. (*Id.*) During this meeting, Offutt accused Osgood of stealing from RDO. (*Id.*) Also during this meeting, "Offutt threatened to 'ruin' James Osgood, and hinted darkly at political connections which would permit him to make good on the threat." (*Id.*)

Shortly thereafter, RDO initiated an investigation of James Osgood, Matthew Osgood, and UBI with the U.S. Attorney's office. (*Id.*) No charges resulted from this investigation. Osgood contends that this investigation arose because the shareholders did not want to buy out Osgood and thus diminish the profits available to them. (*Id.*) In sum, Osgood and UBI contend that "telling lies to law enforcement agents and United Brands/James Osgood's customers in the hopes that those lies would lead to the wrongful conviction of James Osgood, and innocent man, and the destruction of his business, is … 'extreme and outrageous conduct.'" (Response to Dismissal/Summary Judgment Motion, doc. # 42 at 12.)

Construing Osgood's and UBI's allegations as true, the Court finds that they have alleged sufficient facts to state a claim upon which reasonable persons may differ. If, as counterclaimants allege, RDO engaged in a personal vendetta to ruin James Osgood and his business, the Court finds that this could cause an ordinary citizen, upon hearing the facts, to exclaim, "Outrageous!", the benchmark for this tort. *Dahlberg v. Lutheran Social Servs.*, 625 N.W.2d 241, 249 (N.D.2001). Counterclaimants thus meet the threshold requirement for proceeding with this claim. RDO's motion for dismissal and/or summary judgment is therefore **DENIED**.

### G. *Breach of contract*

By way of a seventh counterclaim, UBI and James Osgood allege breach of contract, civil conspiracy, and fraud. The Court will address each in turn. First, RDO objects to the breach of contract claim since defendants allege this tort on behalf of James Osgood and UBI. Since UBI was not a party to the shareholder agreement, which is the subject of the breach of contract claim, RDO contends that this claim is defective. In response, counterclaimants assert that they inadvertently included UBI. The Court therefore strikes UBI as a party to this counterclaim but the remainder of the breach of contract claim remains.

### H. *Fraud*

Second, RDO objects to the claim of fraud, claiming that it fails as a matter of law and is not particularly pled. Counterclaimants seemingly agree that the fraud claim cannot stand as a separate cause of action against RDO, but they argue that it forms part of the basis for the civil conspiracy claim. As such, and because the Court agrees with RDO that the fraud claim fails as a matter of law, RDO's motion for dismissal on this claim is **GRANTED**.

### I. *Civil conspiracy*

Third, RDO objects to the civil conspiracy claim. In so doing, RDO argues that a conspiracy, by definition, requires an agreement between two or more persons and that, because RDO and its agents comprise a single legal entity, they are legally incapable of conspiracy. In response, counterclaimants first allege that while this is true in some courts, North Dakota has not adopted this view, and, second, in the courts that have adopted the view, it only applies when the agents have acted within the scope of employment.

Although North Dakota has never specifically held that a corporation acting through its agents may not be liable for conspiracy, the Court holds that, given the chance, they would. The Court has found several courts which have adopted this view and no court which has held otherwise. *See, e.g., Larson ex rel. Larson v. Miller,* 76 F.3d 1446, 1456 n. 6 (8th Cir. 1996); *American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.,* 151 F.Supp.2d 723, 731 (W.D.Va.2001) ("A conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility."); *Nilavar v. Mercy Health Sys.,* 142 F.Supp.2d 859, 888 (S.D.Ohio 2000); *McCraven v. City of Chicago,* 109 F.Supp.2d 935, 946 (N.D.Ill.2000) ("[C]orporation only acts through its officers, directors, and agents and is incapable of conspiring with those designated to act on its behalf.").

It is true, as counterclaimants allege, that a conspiracy may be established against agents of the corporation when the agents act outside the scope of their employment. *Garza v. City of Omaha,* 814 F.2d 553, 556 (8th Cir.1987). However, in order to invoke this exception, the agents must be named as individuals in the action. *Id.* Counterclaimants did not bring suit against the shareholders of RDO in either their official or individual capacities. Rather, counterclaimants allege civil conspiracy against RDO only. Therefore, the civil conspiracy claim must fail. RDO's motion to dismiss this claim is **GRANTED**.

### J. *Defamation claims*

Finally, RDO contends that counterclaimants' defamation claim and all claims arising from the defamation claim fail. RDO argues that the North Dakota statute allows a defamation claim to go forward only if the complaining party has made a timely and adequate request for

clarification, and it applies additionally to all other claims for relief arising out of the defamation. Idaho has no such requirement. Moreover, the law in Idaho is not premised upon a statute but instead upon common law. Thus, the Court finds that there is a conflict of law between the states, and to simplify future proceeding in this matter, the Court will perform a choice of law analysis. The first issue that the Court must resolve, then, is whether North Dakota's or Idaho's choice of law rule applies.

The U.S. Supreme Court has held that where an action is transferred upon request of the defendant, the transferee court shall apply the transferor forum's law. *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). James Osgood and UBI originated their present counterclaims as the action in Idaho, which was transferred to this court upon the request of RDO. Thus, the court finds it appropriate to apply Idaho's choice-of-law rule to determine whether North Dakota's or Idaho's defamation law should govern this action. See *Computer Aid, Inc. v. Hewlett–Packard Co.*, 56 F.Supp.2d, 526, 532 (E.D.Pa.1999) (holding, in similar circumstances, that the transferor court's choice-of-law rules should apply).

■ In tort actions, Idaho has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws to determine which state's law is applicable. *Estate of Braun v. Cactus Pete's, Inc.*, 108 Idaho 798, 702 P.2d 836, 838 (1985). This determination is a question of law. *Seubert Excavators, Inc. v. Anderson Logging Co.*, 126 Idaho 648, 889 P.2d 82, 85 (1995). The Restatement factors followed by the Idaho Supreme Court evaluate the following contacts: (1) place where injury occurred, (2) place where conduct causing injury occurred, (3) domicile, residence, nationality, place of incor-poration, and place of business of parties, and (4) place where relationship, if any, between parties is centered. *Id.* (citing Restatement (Second) of Conflict of Laws § 145). The most important of these contacts is the place where the injury occurred. *Id.*

### 1. Place where injury occurred

Osgood asserts that the false statements made by RDO and its agents harmed his business and personal reputation and harmed him financially. Osgood is a resident of Idaho and his business is located in Idaho. Thus, it is clear that any injury that occurred, occurred in Idaho.

### 2. Place where conduct causing injury occurred

From the papers submitted by the papers, it seems as though most of the conduct causing the injury occurred in Fargo; this is where RDO commenced its investigation of UBI, James Osgood, and Matthew Osgood. This factor, then, favors RDO.

### 3. Location of parties

While RDO is located in North Dakota, James Osgood and UBI are located in Idaho. Thus, this factor is a wash.

### 4. Place where relationship is centered

The relationship of the parties seems to be centered in North Dakota, since this is where Osgood and UBI contractually entered into a relationship with RDO.

Evaluating these factors, the Court finds that Idaho has the most significant relationship to the defamation claim. While two of the four factors favor RDO, the most important factor, the place where the injury occurred, clearly favors Idaho. Furthermore, Idaho most likely has a strong interest in protecting Osgood, one

of its own residents, from defamation. Accordingly, the Court holds that the state of Idaho has the most significant relationship to this dispute. Therefore, Idaho law governs the defamation claim. RDO's arguments that the North Dakota statute precludes assertion of this claim is thus irrelevant. RDO motion for dismissal/summary judgment of this claim is **DENIED.**

## V. Conclusion

In sum, Matthew Osgood's motion to dismiss the action against him for lack of personal jurisdiction is **DENIED** (doc. # 5). The motion by RDO to dismiss the counterclaims of defendants James A. Osgood and "UBI", and/or grant summary judgment with respect to these claims is **GRANTED IN PART**, and **DENIED IN PART** (doc. # 32). The following counterclaims are **DISMISSED:**

(1) Interference with prospective business advantage alleged by UBI and James Osgood;

(2) Fraud alleged by UBI and James Osgood; and

(3) Civil conspiracy alleged by UBI and James Osgood.

All other claims remain, as explained above.

**IT IS SO ORDERED.**